Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/30/2026 08:08 AM CDT

JASON MARTINEZ, APPELLANT, V. AMERIGREEN, LLC,
DOING BUSINESS AS THE HIVE BAR, APPELLEE.

___ N.W.3d ___

Filed June 30, 2026.    No. A-25-197.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a
   lower court's grant of summary judgment if the pleadings and admitted
   evidence show that there is no genuine issue as to any material facts or
   as to the ultimate inferences that may be drawn from the facts and that
   the moving party is entitled to judgment as a matter of law.
2. ____: ____. An appellate court reviews the district court's grant of sum-
   mary judgment de novo, viewing the record in the light most favorable
   to the nonmoving party and drawing all reasonable inferences in that
   party's favor.
3. **Negligence: Damages: Proximate Cause.** In order to prevail in a neg-
   ligence action, a plaintiff must establish the defendant's duty to protect
   the plaintiff from injury, a failure to discharge that duty, and damages
   proximately caused by the failure to discharge that duty.
4. **Negligence.** In Nebraska, a premises liability case generally falls into
   one of three categories: (1) those concerning the failure to protect lawful
   entrants from a dangerous condition on the land, (2) those concerning
   the failure to protect lawful entrants from a dangerous activity on the
   land, and (3) those concerning the failure to protect lawful entrants from
   the acts of a third person on the land.
5. ____. Negligence and premises liability are not necessarily separate
   torts; premises liability is informed by and based on common-law prin-
   ciples of negligence.
6. ____. Not every negligence action involving an injury suffered on some-
   one's land is properly considered a premises liability case.
7. **Pleadings: Words and Phrases.** Nebraska law defines pleadings as the
   written statements by the parties of the facts constituting their respective
   claims and defenses.

8. **Pleadings.** The purpose of pleadings is to frame the issues upon which a cause is to be tried, and the issues in a given case will be limited to those which are pleaded.

9. **Pleadings: Summary Judgment.** The pleadings frame the issues to be considered on a motion for summary judgment, and courts may not enter summary judgment on an issue not presented by the pleadings.

10. **Summary Judgment.** Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

11. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

12. ____: ____. If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

13. **Torts: Liability: Negligence: Probable Cause.** It suffices to charge a person with liability for a negligent act if some injury to another ought reasonably to have been foreseen as the probable result thereof by the ordinarily intelligent and prudent person under the same circumstances.

14. **Negligence.** In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence.

15. ____. Deciding what is reasonably foreseeable involves common sense, common experience, and application of the standards and behavioral norms of the community—matters that have long been understood to be uniquely the province of the finder of fact.

16. ____. Foreseeability is a fact-specific inquiry that requires a finder of fact to ask what the defendant knew, when they knew it, and whether a reasonable person would infer from those facts that there was a danger.

17. ____. Courts should leave determinations of foreseeability to the trier of fact unless no reasonable person could differ on the matter.

18. ____. If the court takes the question of negligence away from the trier of fact because reasonable minds could not differ about whether an

actor exercised reasonable care (for example, because the injury was not reasonably foreseeable), the court's decision merely reflects the one-sidedness of the facts bearing on negligence and should not be misrepresented or misunderstood as involving exemption from the ordinary duty of reasonable care.

19. ____. Although foreseeability is a question of fact, there remain cases where foreseeability can be determined as a matter of law, such as summary judgment.

20. ____. In order to make a risk of attack foreseeable, the circumstances to be considered must have a direct relationship to the harm incurred.

21. **Negligence: Liability.** The modern general rule, summarized in its simplest terms, is that the proprietor of a place of business who holds it out to the public for entry for business purposes is subject to liability to members of the public while upon the premises for such a purpose for bodily harm caused to them by the accidental, negligent, or intentionally harmful acts of third persons, if the proprietor by the exercise of reasonable care could have discovered that such acts were being done or were about to be done, and could have protected the members of the public by controlling the conduct of the third persons or by giving a warning adequate to enable them to avoid harm.

22. **Negligence.** The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.

23. ____. It is for the fact finder in a negligence case to determine, on the facts of each individual case, whether or not the evidence establishes a breach of that duty.

24. **Negligence: Liability: Proximate Cause.** A possessor of land is subject to liability for injury caused to a lawful visitor by a condition on the land if (1) the possessor either created the condition, knew of the condition, or by existence of reasonable care could have discovered the condition; (2) the possessor should have realized the condition involved an unreasonable risk of harm to the lawful visitor; (3) the possessor should have expected that a lawful visitor such as the plaintiff either (a) would not discover or realize the danger or (b) would fail to protect himself or herself from the danger; (4) the possessor failed to use reasonable care to protect the lawful visitor against the danger; and (5) the condition was a proximate cause of damage to the plaintiff. The first three elements identify those conditions on the land regarding which a land possessor owes a duty of reasonable care to protect lawful entrants from physical harm.

25. **Negligence: Words and Phrases.** An unreasonable risk of harm is a risk that a reasonable person, under all the circumstances of the case, would

not allow to continue. In other words, the risk of harm incident to a condition on the property must be uniquely or unacceptably high, something more than the usual risks commonly encountered.

26. **Negligence: Liability.** A land possessor is not liable to a lawful entrant on the land unless the possessor has or should have had superior knowledge of the dangerous condition. Consequently, even where a dangerous condition exists, a premises owner will not be liable unless the premises owner should have expected that a lawful visitor such as the plaintiff would not discover or realize the danger or would fail to protect himself or herself from the danger.

27. **Negligence.** When a dangerous condition is open and obvious, the owner or occupier is not liable in negligence for harm caused by the condition. This is because known or obvious dangers pose less of a risk of harm than comparable latent dangers because those exposed can take precautions to protect themselves.

Appeal from the District Court for Douglas County: Derek R. Vaughn, Judge. Affirmed.

James K. McGough, of McGoughLaw, P.C., L.L.O., for appellant.

Matthew V. Rusch and Raymond E. Walden, of Erickson | Sederstrom, P.C., L.L.O., for appellee.

Moore, Bishop, and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

On New Year's Eve 2014, Jason Martinez visited The Hive Bar (the bar), which was located in downtown Omaha, Nebraska. Shortly after midnight, Martinez was involved in a confrontation with two other patrons on the bar's dance floor. During this encounter, one of the patrons threw a drinking glass at him. According to Martinez, the glass hit his face, shattered, and caused severe injuries. Martinez filed an action in the Douglas County District Court against the two patrons and the bar. The district court granted summary judgment in favor of the bar and dismissed the action with prejudice

against the two patrons. Martinez appeals only the order granting summary judgment in favor of the bar. We affirm.

## II. BACKGROUND

### 1. Procedural Background

On January 13, 2017, Martinez filed a second amended complaint against Amerigreen, LLC, doing business as the bar, and sisters Andie Tolle and Kassie Tolle. The pleading alleged that on December 31, 2014, Martinez, Andie, and Kassie were all present at the bar. At some point that night, Kassie, either "separately or working in concert with" Andie, "assaulted and battered" Martinez by "pushing him." After the shove, Andie threw a drinking glass at Martinez, which hit his face. Upon making contact, the glass shattered, causing severe facial lacerations. The pleading also alleged that Amerigreen "took no action to stop or prevent" Andie and/or Kassie "from further assaulting or battering" him after the initial push. Because this appeal does not involve Martinez' intentional tort claims against the sisters, we focus our attention on Martinez' claim against Amerigreen only.

Martinez asserted a cause of action for "Negligence" against Amerigreen. He claimed that Amerigreen "had a duty to protect all [patrons] from harm" and that it "breached its duty by failing to protect" Martinez from physical injury. He claimed Amerigreen was negligent in (1) "fail[ing] to provide a safe environment," (2) "fail[ing] to provide adequate security," (3) "fail[ing] to limit the number of guests or patrons that it allowed into its business to minimize any physical confrontations," (4) "provid[ing] glassware to its patrons . . . that was unsafe," and (5) "fail[ing] to prevent [Martinez] from sustaining injuries." These negligent acts and/or omissions, according to Martinez, directly and proximately caused $11,924.42 in medical expenses, an "unknown" amount of future medical expenses, an "unknown" amount of present and future lost wages, and general damages for pain and suffering.

In an amended answer to Martinez' second amended complaint, Amerigreen conceded that "it operate[d] a bar" and that Andie and Kassie were patrons at the time of the incident. However, it "affirmatively allege[d] that it maintain[ed] strict control over who [was] allowed entry" to the premises. Amerigreen otherwise denied all allegations of negligence.

## 2. Motion for Summary Judgment

On February 27, 2017, Amerigreen filed a motion for summary judgment. The motion alleged that there were "no genuine issues of material fact as to [Amerigreen's] liability" and that "judgment must be entered" against Martinez. A hearing on the motion was held on April 24. At the hearing, the district court received as evidence copies of the operative pleadings, various depositions, interrogatory answers, security footage from the bar, and other documents. We set forth the relevant facts below.

### (a) Bar Policies and Procedures

The bar was managed by Jacob Gardner and had a maximum occupancy of 285 patrons. In order to adhere to this capacity limit, Gardner employed "two . . . or three" "counter[s]" to keep track of everyone entering and exiting the establishment. Once the 285-person limit was reached, a "one out, one in" policy was followed. "[C]lickers" were used to assist employees with counting. According to Gardner, the "doormen" stationed at the bar's entrance would sometimes test the patience of customers seeking to enter the building by making them "wait in . . . line for a few minutes" while allowing other groups of people inside.

On a normal day, Gardner had "two to three" security workers standing at the bar's entrance and "three to four" others "roaming" inside the establishment. He made sure there was at least one worker "eagle-eyeing . . . every room." Each employee tasked with security was put through an "extensive program on security protocols" created by Gardner. He based these protocols on "best practices from different cities," such

as New York and San Francisco. Gardner stated that "every best practices manual" he read indicated that 50 patrons for every security guard is "the highest standard out there" and "is as golden as it gets."

Security workers at the bar were required to go through a 75-page "best practices safety manual" authored by Gardner. No test on the manual's content was ever administered, but Gardner explained that he personally observed security personnel every night the bar was open. An employee's failure "to wrap [their] head around" the manual would result in an "excus[al] from service." Security workers were provided "smaller protocol manuals" to take home. Security personnel would also participate in "[q]uarterly" "mass training[s]." Gardner did not initially arrange for local law enforcement to be present at the bar during operating hours. However, the aftermath of the New Year's Eve incident "helped" him make the decision to hire local law enforcement and station two police officers at the bar's entrance during operating hours.

(b) New Year's Eve Incident

Sometime around 10:30 or 11 p.m. on New Year's Eve 2014, Martinez and a group of five other individuals arrived at the bar. According to Martinez, there were two "bouncers" at the bar's entrance. One was "checking identifications" and the other "appeared [to] allow[] one person in for every one person that left the bar." After waiting in line for "a brief time," Martinez and his group were "waived [sic] in by a bouncer." In an affidavit received by the district court, Martinez averred that after he saw the bouncer, his group was "allowed into the bar without having to wait in line." During his deposition, Gardner stated Martinez "wouldn't have waited in line if [he] saw him" that night because the two were friends. The bouncers on duty that night "kn[e]w the people that [were] important" to Gardner, and "if one of them had seen" Martinez, they would have immediately allowed him entry. Other than the "two bouncers [standing]

outside the front door of the bar," Martinez did not remember seeing any other security upon entering the building. According to Gardner, a total of seven employees, including himself, were tasked with security duties that night.

Over a period of 4½ hours, Martinez consumed four tequila shots. Two of these shots were taken at an unrelated restaurant prior to his arrival at the bar, and the others were consumed upon entering the bar. Martinez admitted these drinks made him "buzzed." The bar was "packed with people," and according to Martinez' affidavit, someone "could not move through the bar without bumping into other patrons."

Andie and Kassie also visited the bar that night. They regularly patronized the bar, and Gardner had never noticed them act inappropriately or be aggressive toward other customers in the past. According to Kassie, she and Andie did not have to wait in line to enter the bar because she was friends with one of the bouncers. After entering, Andie and Kassie each purchased an alcoholic beverage, which was served in a drinking glass provided by the bar. The sisters did not consume any alcohol prior to their arrival at the bar, and in Gardner's opinion, they did not appear to be intoxicated that night. At some point, Andie and Kassie made their way to the bar's dance floor.

Shortly after midnight, Martinez began "dancing on a crowded dance floor." Security footage obtained from the bar and received at the summary judgment hearing shows Gardner positioned in a "DJ booth" overlooking the bar's dance floor at 12:15 a.m. He appears to be adjusting the booth's sound equipment and periodically observing customers on the dance floor. Martinez can be seen close to the center of the dance floor surrounded by a large crowd. At first, he remains relatively still, waving what seems to be an elongated "glow stick." However, a little over 40 seconds into the footage, Martinez becomes more active and begins "jumping" and "bouncing" around. According to Andie, Martinez bumped into her twice. Martinez agreed during his deposition that he

was bumping into numerous people while dancing but did not specifically recall colliding with Andie or Kassie.

While there is some disagreement between Martinez and the sisters as to what transpired next, the security footage establishes that Andie and Martinez engaged in a brief scuffle that consisted of mutual pushes. Kassie then shoved Martinez, and immediately after, Andie threw a drinking glass toward him. Martinez stated this drinking glass "[h]it [his] face and bounced off." He acknowledged that it was "[t]ough to tell" from the security footage whether the drinking glass shattered upon contact with his face. Martinez, however, maintained the glassware did break because he located a piece of glass in his pocket sometime after the incident. The drinking glass thrown by Andie had a "three-ounce hard glass base," but the top of the glass was "wine glass quality," "very thin," and "easily" breakable. At the time of Gardner's deposition, the bar no longer carried glassware.

After the confrontation, Gardner rushed to the dance floor. He proceeded to "kick[] all of [Martinez'] friends out" of the bar and blamed them for the whole incident. Gardner was adamant that it was "a hard call" but he "always err[ed] on the side of . . . protect[ing] women." Andie and Kassie were permitted to remain on the property.

By the time Gardner reached the dance floor, Martinez had already left the area and was "grabbed," taken to a "back room," and treated by what he described as "medical staff." Gardner clarified that the individuals rendering aid to Martinez were not employed by the bar but were "Marines and volunteer firemen" who also patronized the bar. Gardner eventually learned Martinez had been harmed and observed his injuries:

> [Martinez' counsel:] So you go to the backroom. You said you saw his face?
>
> [Gardner:] Yeah, [I] saw his face.
>
> [Martinez' counsel:] Tell me what you saw.

[Gardner:] It was mangled, you know. I, I, I didn't think he'd ever be the same. I cannot believe we're sitting here looking at a kid that his face is still the way it is, intact.

[Martinez' counsel:] Bloody?

[Gardner:] It was so bloody, so much blood, so much nasty — I mean just so many cuts, and the cuts were coming so deep from in the well of the eye, like from the tear duct and from — it was just the nastiest thing I'd ever seen on a face.

After leaving the bar, Martinez sought medical attention at a hospital.

According to Gardner, the situation involving Martinez was "the only violent incident" that had ever occurred at the bar. In his opinion, nothing different could have been done to prevent Martinez' injuries.

### 3. Arguments for and Against Summary Judgment

At the summary judgment hearing, the district court afforded Amerigreen and Martinez an opportunity to make arguments on the record. Amerigreen asserted Martinez' claim of negligence was "nothing more than speculation." It pointed out that "there was no history of violence" at the bar, "no evidence . . . that [the bar] was overcrowded" on the night of the incident, and "no actual evidence that there were too few" security personnel. Accordingly, Amerigreen contended Martinez failed to meet his burden of showing a breach of any legal duty or, alternatively, that any negligence on the part of the bar was the proximate cause of Martinez' injuries.

Martinez responded by directing the district court to several "issues of material fact." He argued there were factual disputes as to whether (1) the bar followed its "one-in-one-out" policy on New Year's Eve, (2) the bar was overcrowded, (3) the bar had an adequate number of security personnel, and (4) the

injuries he sustained were foreseeable, in light of these alleged acts and/or omissions.

### 4. District Court's Order and Appeal

On June 6, 2017, the district court entered an order granting Amerigreen's motion for summary judgment. In its order, the court observed that "[p]roximate cause, as used in the law of negligence, is that cause which in a natural and continuous sequence unbroken by any efficient intervening cause, produces that injury, and without which the injury would not have occurred." It also noted that "[a]n alleged cause of an accident may merely be a condition and not the real cause," that it "is not sufficient if the negligence charged does nothing more than furnish a condition by which injury is made possible," and that if "the condition causes injury through the subsequent independent act of a third person, the two acts are not concurrent, and the existence of the condition is not the proximate cause of the injury." It then concluded that "the negligence alleged by" Martinez as to Amerigreen "did nothing more than at best create a condition by which" his "injuries were made possible." It also found that "the intentional and possibly illegal acts of" Andie and Kassie "were not reasonably foreseeable by" Amerigreen.

Martinez attempted to appeal the district court's entry of summary judgment in 2017. This court, however, dismissed his appeal, concluding the district court's summary judgment order was not a final, appealable order because Martinez still had pending intentional tort claims against Andie and Kassie. In an order entered on February 21, 2025, those claims were dismissed with prejudice, and Martinez' appeal is now properly before us.

## III. ASSIGNMENT OF ERROR

Martinez assigns that the district court erred in granting summary judgment in favor of Amerigreen.

## IV. STANDARD OF REVIEW

[1,2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Strahan v. McCook Hotel Group*, 317 Neb. 350, 10 N.W.3d 187 (2024). An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Id.*

## V. ANALYSIS

### 1. WHAT IS PROPER LEGAL FRAMEWORK?

[3] In its order granting summary judgment, the district court appears to have disposed of Martinez' claim against Amerigreen under general principles of negligence. In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020). The trial court concluded that any negligence committed by Amerigreen was not the proximate cause of Martinez' injuries because "at best" it only "create[d] a condition by which" his "injuries were made possible." In addition to this determination, the court also concluded that the acts of Andie and Kassie "were not reasonably foreseeable by" Amerigreen. In his brief, Martinez largely takes issue with the latter finding, and his argument centers on the concept of foreseeability.

[4-6] However, as Amerigreen points out in its brief, some negligence claims against possessors of land are properly examined under a specialized set of rules and standards known in this state's tort jurisprudence as premises liability. In Nebraska, a premises liability case generally falls into one of three categories: (1) those concerning the failure to protect

lawful entrants from a dangerous condition on the land, (2) those concerning the failure to protect lawful entrants from a dangerous activity on the land, and (3) those concerning the failure to protect lawful entrants from the acts of a third person on the land. *Strahan v. McCook Hotel Group, supra*. It has been said that negligence and premises liability are not necessarily separate torts but that premises liability is informed by and based on common-law principles of negligence. See 62 Am. Jur. 2d Premises Liability § 1 (2018). But the Nebraska Supreme Court has consistently cautioned that "'[n]ot every negligence action involving an injury suffered on someone's land is properly considered a premises liability case.'" *Sundermann v. Hy-Vee*, 306 Neb. at 765, 947 N.W.2d at 504 (quoting *Hodson v. Taylor*, 290 Neb. 348, 860 N.W.2d 162 (2015)). Nowhere in its summary judgment order did the district court discuss the applicability of premises liability principles to Martinez' claims. Nor does the record contain any indication that its potential import was brought to the attention of the trial court by the parties.

Nevertheless, Amerigreen argues on appeal that the matter before us falls squarely within the third category of premises liability cases (i.e., failure to protect lawful entrant from the acts of a third person on the land). This is because Martinez has sued Amerigreen, the owner or possessor of real property, claiming he was injured by its failure to protect him from being assaulted and battered by Andie and Kassie. Accordingly, Amerigreen contends the case must be resolved "through [the] application of the traditional test for premises liability" involving harm caused to a patron by a third party while on a proprietor's property. Brief for appellee at 16.

As it relates to Amerigreen, Martinez' second amended complaint contains a "Cause of Action" labeled "Negligence." Under this heading, Martinez alleges that Amerigreen had a duty to protect patrons from harm and that his injuries were the direct and proximate result of the following negligent acts and/or omissions:

    a. [Amerigreen] failed to provide a safe environment for guests and patrons;

    b. [Amerigreen] failed to provide adequate security for its guests and patrons;

    c. [Amerigreen] failed to limit the number of guests or patrons that it allowed into its business to minimize any physical confrontations such as pushing or shoving by guests or patrons;

    d. [Amerigreen] provide [sic] glassware to its patrons, including [Andie and Kassie] that was unsafe; and

    e. [Amerigreen] failed to prevent [Martinez] from sustaining injuries.

The district court, by virtue of its summary judgment order, disposed of all asserted theories of breach "with prejudice." On appeal, Martinez appears to have abandoned most of the allegations listed above. While Martinez makes cursory mention in his brief of Amerigreen's alleged negligence in serving drinks in "unsafe glasses" and providing "inadequate security," brief for appellant at 17, he primarily argues that the trial court erred in granting summary judgment because "[t]he evidence offered at the hearing demonstrated that there was a genuine issue of . . . material fact regarding the foreseeability of [his] injuries after the bar created an environment ripe for injury when it overpacked the bar on New Year's Eve," *id*. at 17-18. He contends the assault perpetrated against him was the "direct result of an overcrowded bar," and the issue of whether Andie and Kassie's actions were foreseeable to Amerigreen, in light of this overcrowding, needs to be resolved by a finder of fact. *Id.* at 23.

In his initial brief, Martinez does not explicitly mention premises liability, although he does cite to Nebraska authorities that utilize the framework. Instead, he seems to analyze the district court's grant of summary judgment under general negligence principles, namely the concept of foreseeability. However, in response to Amerigreen's assertion that this case ought to be resolved under the third category of premises

liability cases (i.e., failure to protect lawful entrants from the acts of a third person on the land), Martinez writes, "This argument ignores the fact that the bar created a *dangerous condition* [overcrowding] that culminated in [his] injuries." Reply brief for appellant at 6 (emphasis supplied). He continues, "Whether [Amerigreen] acted in a way that *produced a dangerous condition* is a fact issue that should be resolved by a jury . . . ." *Id.* (emphasis supplied). From these statements, it appears that Martinez is, in his reply brief, recontextualizing his overcrowding claim as one falling within the first category of premises liability cases (i.e., failure to protect lawful entrants from a dangerous condition on the land).

[7-9] Martinez' overcrowding claim, as pled, does not seem to be based upon a theory of premises liability. Nebraska law defines pleadings as the written statements by the parties of the facts constituting their respective claims and defenses. *Russell v. Clarke*, 15 Neb. App. 221, 724 N.W.2d 840 (2006). The purpose of pleadings is to frame the issues upon which a cause is to be tried, and the issues in a given case will be limited to those which are pleaded. *Welsch v. Graves*, 255 Neb. 62, 582 N.W.2d 312 (1998). The pleadings frame the issues to be considered on a motion for summary judgment, and courts may not enter summary judgment on an issue not presented by the pleadings. *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023). Regarding the overcrowding claim, Martinez alleged that Amerigreen "failed to limit the number of guests . . . to minimize any physical confrontations." His pleading further alleged that "[a]s the owner and operator of a bar . . . that was filled to capacity, or exceeded it during the relevant times, pushing and/or shoving between guests and/or patrons was foreseeable" to Amerigreen.

Martinez does not appear to be claiming that the bar's employees failed to protect him from the intentional acts of other patrons; he instead alleges that the bar was negligently crowded past its capacity and that the overcrowding proximately caused the confrontation that led to his injuries. In

a similar vein, nowhere in his second amended complaint did Martinez allege that the overcrowding itself constituted a dangerous condition, nor did he plead facts related to the other unique elements essential to a dangerous condition premises liability case.

However, for the sake of completeness, we analyze Martinez' overcrowding claim under principles of both general negligence and premises liability. As detailed below, regardless of what framework is utilized, the result is the same: The district court did not err in entering summary judgment.

### 2. General Negligence

#### (a) General Principles Governing Summary Judgment

[10-12] Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Strahan v. McCook Hotel Group*, 317 Neb. 350, 10 N.W.3d 187 (2024). The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. *Id.* If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id.* And, if the burden of proof at trial would be on the nonmoving party, as in this case, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.*

As previously set forth, in order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020). Here, neither party disputes that Amerigreen owed a duty of reasonable care to its patrons, including Martinez, on the night of the incident. See *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016) (businesses that are open to public are subject to duty of reasonable care, regardless of whether they serve alcoholic liquor). We therefore focus our analysis on the other elements of a general negligence claim, namely breach of duty, which encompasses the foreseeability of harm.

### (b) Injuries Not Reasonably Foreseeable as Matter of Law

[13-15] It suffices to charge a person with liability for a negligent act if some injury to another ought reasonably to have been foreseen as the probable result thereof by the ordinarily intelligent and prudent person under the same circumstances. *Susman v. Kearney Towing & Repair Ctr.*, 310 Neb. 910, 970 N.W.2d 82 (2022). In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence. *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010). "[D]eciding what is reasonably foreseeable involves common sense, common experience, and application of the standards and behavioral norms of the community—matters that have long been understood to be uniquely the province of the finder of fact." *Id.* at 212, 784 N.W.2d at 914.

[16-19] In other words, foreseeability is a fact-specific inquiry that requires a finder of fact to ask what the defendant knew, when they knew it, and whether a reasonable person would infer from those facts that there was a danger. See

*Thomas v. Board of Trustees*, 296 Neb. 726, 895 N.W.2d 692 (2017). Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. *A.W. v. Lancaster Cty. Sch. Dist. 0001, supra*. And if the court takes the question of negligence away from the trier of fact because reasonable minds could not differ about whether an actor exercised reasonable care (for example, because the injury was not reasonably foreseeable), then the court's decision merely reflects the one-sidedness of the facts bearing on negligence and should not be misrepresented or misunderstood as involving exemption from the ordinary duty of reasonable care. *Id.* Therefore, although foreseeability is a question of fact, there remain cases where foreseeability can be determined as a matter of law, such as by summary judgment. *Thomas v. Board of Trustees, supra*.

Martinez asserts that the "most significant issue of material facts [sic] focused on whether the bar breached its duty to provide a safe environment for its patrons by deviating from its established occupancy policy and overpacked the bar." Brief for appellant at 18-19. He argues a trier of fact could reasonably conclude that the confrontation between himself and the sisters was foreseeable to Amerigreen because it occurred "on New Years [sic] Eve, a night associated with heavy alcohol consumption and crowded gatherings." *Id.* at 23. He further contends that "[i]t is unreasonable to assume that a bar owner would have no appreciation of those facts." *Id.*

We agree with Martinez that, when viewing the record in the light most favorable to him, a fact finder could infer that the bar strayed from its occupancy policy on the night in question. In an affidavit received by the district court, Martinez averred that upon arriving at the bar, "there was a line of approximately 20 people waiting to get into the bar," and "it appeared that the bouncer was allowing one person in for every one person that left the bar." According to Gardner, this "one out, one in" policy would only be implemented when the bar reached its 285-person capacity. However, once Martinez

"saw the bouncer," he was "allowed into the bar without having to wait in line." These averments are consistent with Gardner's deposition testimony wherein he indicated security personnel would have let Martinez skip the line that night, due to their longtime friendship. It is also relevant to note that the sisters were able to enter the establishment without having to wait in line because Kassie was friends with one of the bouncers. Martinez' affidavit also contained averments that the establishment was "packed with people" and that it was impossible to "move through the bar without bumping into other patrons." This close quarters environment was "constant the entire time" he was at the bar. From this evidence, a fact finder could reasonably infer the bar was overcrowded on New Year's Eve.

[20] Nonetheless, in order to make a risk of attack foreseeable, the circumstances to be considered must have a direct relationship to the harm incurred. *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016). Here, even when viewing the evidence in the light most favorable to Martinez, no such relationship exists, and no reasonable person could conclude otherwise. Although Martinez asserts that heavy alcohol consumption and close-quarters dancing in an overcrowded bar would put a prudent tavernkeeper on notice of the probability of violent confrontations, his deposition testimony revealed that he viewed casual contact as nothing major and continued to dance even after "bumping into numerous people." Further, Martinez adduced no evidence that the bar had previous fights or altercations stemming from overcrowded conditions. In fact, according to Gardner, the New Year's Eve fight was "the only violent incident" to have occurred at the bar, and the sisters had no prior altercations at the establishment. Andie even stated during her deposition testimony that the bar was no busier than usual on the night of the scuffle and that it was "always pretty crowded." While an injury sustained as a result of tripping on another person or being trampled by a crowd would undoubtably be foreseeable to a bar owner who

allows his or her establishment to become overcrowded, it is not reasonable to posit that overcrowding alone would place a reasonable proprietor on notice that a sudden, violent attack will be triggered by that condition alone. But we do note that our decision is confined to the particular facts of this case. See *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010) (extent of foreseeable risk depends on specific facts of case and cannot be usefully assessed for category of cases; small changes in facts may make dramatic change in how much risk is foreseeable).

Accordingly, after viewing the evidence in the light most favorable to Martinez, we conclude that Amerigreen did not breach its legal duty to Martinez as a matter of law because the attack by Andie and Kassie was not a foreseeable risk simply because the bar was overcrowded.

### 3. PREMISES LIABILITY

#### (a) Failure to Protect From Acts of Third Person on Land

[21] Amerigreen contends that Martinez' claim should be resolved under premises liability principles. It specifically argues that the third category of premises liability cases (i.e., failing to protect lawful entrants from the acts of a third person on the land) controls in this matter. In *Hughes v. Coniglio*, 147 Neb. 829, 833, 25 N.W.2d 405, 408 (1946), the Nebraska Supreme Court articulated the duty a proprietor of an establishment held open to the public owes to his patrons:

> The modern general rule, summarized in its simplest terms, is that the proprietor of a place of business who holds it out to the public for entry for his business purposes, is subject to liability to members of the public while upon the premises for such a purpose for bodily harm caused to them by the accidental, negligent, or intentionally harmful acts of third persons, if the proprietor by the exercise of reasonable care could have discovered that such acts were being done or were about to be done,

and could have protected the members of the public by controlling the conduct of the third persons or by giving a warning adequate to enable them to avoid harm.

However, in its briefing, Amerigreen identifies an apparent conflict in our jurisprudence concerning whether the concept of foreseeability in these types of cases is analyzed under the lens of legal duty or breach. Compare *Harvey v. Van Aelstyn*, 211 Neb. 607, 319 N.W.2d 725 (1982) (possessor of premises has legal duty to take precautionary measures to protect against acts of third persons only where such acts are reasonably anticipated), *Schroer v. Synowiecki*, 231 Neb. 168, 435 N.W.2d 875 (1989) (key to proprietor's duty is foreseeability of injury to patron from third person), and *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020) (scope of duty in dangerous condition premises liability case determined by analyzing foreseeability factors), with *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010) (foreseeable risk is element in determination of negligence, not legal duty), and *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016) (treating foreseeability under element of breach in premises liability case concerning harm caused by third party in bar parking lot). This court has also previously stated:

> While the Nebraska Supreme Court has established a test for determining when a possessor of land is liable for injury to a lawful entrant caused by a dangerous condition on the land, . . . it has not established a test for determining liability for injuries caused by a failure to protect lawful entrants from the acts of a third person on the land.

*Perry v. Buchanan*, 31 Neb. App. 715, 722, 988 N.W.2d 537, 544 (2023).

[22,23] The answer to this doctrinal nuance is not trivial. The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *A.W. v. Lancaster Cty. Sch. Dist. 0001, supra*. But it is for the fact finder to determine, on the facts of each

individual case, whether or not the evidence establishes a breach of that duty. *Id.* Many leading authorities in the tort canon have grappled with whether foreseeability should be treated as a limitation on legal duty or as a component of proximate cause or breach to be weighed by a fact finder. See, e.g., *Palsgraf v. Long Island R. R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). In the context of summary judgment, where a trial court must determine whether a genuine issue of material fact precludes judgment as a matter of law, the distinction between legal duty and breach could be critical. While we appreciate Amerigreen's thorough briefing on the matter, we find it unnecessary to resolve the apparent conflict in our case law. As outlined above, we have already determined that Martinez' injuries were not foreseeable as a matter of law. Accordingly, it does not matter whether that conclusion is framed as the absence of a legal duty or the absence of breach of duty under a premises liability framework; the result is the same.

### (b) Failure to Protect From Dangerous Condition

Martinez makes references in his briefing to Amerigreen's purported failure in providing a safe environment for its patrons by overcrowding the bar. In his reply brief, Martinez argues Amerigreen "created a *dangerous condition* that culminated in [his] injuries." Reply brief for appellant at 6 (emphasis supplied). This language seems to evoke the first category of premises liability cases (i.e., failure to protect lawful entrants from a dangerous condition on the land).

[24] For more than 30 years, the Nebraska Supreme Court has applied the same five-factor rule to premises liability actions involving a condition on the land. See *Sundermann v. Hy-Vee, supra*. A possessor of land is subject to liability for injury caused to a lawful visitor by a condition on the land if (1) the possessor either created the condition, knew of the condition, or by existence of reasonable care could

have discovered the condition; (2) the possessor should have realized the condition involved an unreasonable risk of harm to the lawful visitor; (3) the possessor should have expected that a lawful visitor such as the plaintiff either (a) would not discover or realize the danger or (b) would fail to protect himself or herself from the danger; (4) the possessor failed to use reasonable care to protect the lawful visitor against the danger; and (5) the condition was a proximate cause of damage to the plaintiff. *Id.* Of the five elements recited above, the first three clarify the scope of a land possessor's duty to lawful entrants. *Id.* This duty has been described as a "'specialized standard of care that include[s] three . . . elements'" in addition to "'the ordinary duty of reasonable care.'" *Id.* at 766, 947 N.W.2d at 505 (quoting *Aguallo v. City of Scottsbluff*, 267 Neb. 801, 678 N.W.2d 82 (2004)). The first three elements identify those conditions on the land regarding which a land possessor owes a duty of reasonable care to protect lawful entrants from physical harm. *Sundermann v. Hy-Vee, supra*.

[25] We find the second and third factors dispositive in this case. The Nebraska Supreme Court has drawn a distinction between conditions which present ordinary or common risks, and those which present unreasonable risks. See *id.* An unreasonable risk of harm is "'a risk that a reasonable person, under all the circumstances of the case, would not allow to continue.'" *Danner v. Myott Park, Ltd.*, 209 Neb. 103, 106, 306 N.W.2d 580, 582 (1981). In other words, the risk of harm incident to a condition on the property must be uniquely or unacceptably high, something more than the usual risks commonly encountered. See *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020). As detailed at length previously, Amerigreen could not have realized that the potential overcrowding of its establishment involved an unreasonable risk of harm because Martinez' injuries were not foreseeable as a matter of law. There was no evidence that there had been any prior altercations or fights stemming from the bar's overcrowded conditions.

[26,27] Further, a land possessor is not liable to a lawful entrant on the land unless the possessor has or should have had superior knowledge of the dangerous condition. *Sundermann v. Hy-Vee, supra*. Consequently, even where a dangerous condition exists, a premises owner will not be liable unless the premises owner should have expected that a lawful visitor such as the plaintiff would not discover or realize the danger or would fail to protect himself or herself from the danger. *Id.* When a dangerous condition is open and obvious, the owner or occupier is not liable in negligence for harm caused by the condition. *Id.* This is because "'[k]nown or obvious dangers pose less of a risk [of harm] than comparable latent dangers because those exposed can take precautions to protect themselves.'" *Id.* at 771, 947 N.W.2d at 507 (quoting 2 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 51, comment *k.* (2012)). In the current matter, the alleged overcrowding of the bar on New Year's Eve was open and obvious to Martinez and other patrons. Evidence adduced at the summary judgment hearing showed that the bar was "always pretty crowded," and Martinez' affidavit made clear that a line of patrons had formed outside the bar by the time he had arrived at the establishment. He further averred that upon entry, one "could not move through the bar without bumping into other patrons." While a reasonable fact finder may be able to infer that the bar was crowded past its capacity on the night of the incident, the condition of overcrowding was open and obvious to Martinez and all other patrons who visited the bar that night.

Accordingly, under the dangerous condition premises liability framework, Amerigreen did not owe a legal duty to protect Martinez from the condition of overcrowding.

### 4. Causation

As a final matter, we note that in its summary judgment order, the district court also determined that Amerigreen's purported negligence was not the proximate cause of Martinez'

injuries because it "did nothing more than at best create a condition by which" the harm was made possible. However, as explained above, the evidence adduced at the summary judgment hearing shows that Martinez' injuries were not foreseeable as a matter of law. Therefore, we need not address the causation issue. See *Sebade v. Sebade*, 320 Neb. 398, 28 N.W.3d 19 (2025) (appellate court not obligated to engage in analysis not necessary to adjudicate case and controversy before it).

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment in favor of Amerigreen.

Affirmed.